Jeannette CORUM et al., Plaintiffs,

v.

BETH ISRAEL MEDICAL CEN-
TER et al., Defendants.

No. 72 Civ. 2654.

United States District Court,
S. D. New York.

Jan. 17, 1974.

See also, D.C., 359 F.Supp. 909.

Louise Lander, Carolyn M. Heft, MFY Legal Services, Inc., Robert P. Borsody, Community Health Law Project, New York City, for plaintiffs.

Lipkowitz, Plaut, Salberg & Harris, New York City, for defendants Beth Israel Medical Center, Ray E. Trussell, M.D., Jefferson J. Vorzimer, M.D.; Irving D. Lipkowitz, K. Wendy Slote, New York City, of counsel.

Paul J. Curran, U. S. Atty., S. D. N. Y., New York City, for Caspar W. Weinberger as Secretary of Health, Education and Welfare and the Federal Hospital Council; Naomi L. Reice, Asst. U. S. Atty., of counsel.

### MEMORANDUM

LASKER, District Judge.

By the present motion,[1] plaintiffs seek summary judgment declaring invalid a regulation promulgated under Section 291c(e)(2) of the Hill-Burton Act, 42 U.S.C. § 291 et seq. Plaintiffs assert, first, that three provisions of the regulation, 42 C.F.R. § 53.111, are invalid because of inconsistency with the governing statute. Second, they argue that the regulation is invalid in its entirety because of the role performed in its adoption by the Federal Hospital Council ("the Council"). Since finding for plaintiffs on the latter ground would make consideration of the former unnecessary, we discuss it first.

### I.  Delegation of Power.

Plaintiffs claim that the method of adoption of the regulation is unconstitutional because the role accorded the Council by the statute is an improper delegation of legislative power[2] violat-

---

1. For prior proceedings in this case, see 359 F.Supp. 909 (S.D.N.Y.1973).

2. The plaintiffs argue alternatively that if the Council's role is not an improper delega-

ing Article I, Section 1 of the United States Constitution. The Act provides:

"The Surgeon General [whose functions have been transferred to the Secretary of Health, Education and Welfare], *with the approval of the Federal Hospital Council* and the Secretary of Health, Education and Welfare, shall by general regulations prescribe

\* \* \* \* \* \*

(e) that the State plan shall provide for adequate hospitals and other facilities for which aid under this part is available, for all persons residing in the State, and adequate hospitals (and such other facilities) to furnish needed services for persons unable to pay therefor. Such regulations may also require that before approval of an application for a project is recommended by a State agency . . . for approval under this part, assurance shall be received by the State from the applicant that . . . (2) there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial veiwpoint." 42 U.S.C. § 291c.

Plaintiffs argue that the requirement of Council approval before the Secretary of Health, Education & Welfare ("the Secretary") can promulgate regulations is unconstitutional, because it delegates legislative power to a private body not subject to the control either of Congress or the Secretary.

The Council consists of the Secretary, as chairman, and twelve members appointed by him, of whom six must be "persons who are outstanding in fields pertaining to medical facility and health activities" and "the other six members shall be appointed to represent the consumers of services provided by such fa-

cilities and shall be persons familiar with the need for such services in urban or rural areas." 42 U.S.C. § 291k(a). Regulations under § 291c cannot be passed without the Council's approval, giving it a veto power over regulations proposed by the Secretary. The Council's role is not limited in practice to approving the regulations submitted to it by the Secretary. It appears that the three provisions which plaintiffs contest (and which we discuss below) were added on the Council's initiative over the opposition of the Secretary. (Plaintiffs' Statement of Material Facts.) Of course, the final say as to a regulation's adoption rests with the Secretary. However, the issuance of regulations apparently comes about through a process of compromise between the Secretary and the Council.

Plaintiffs argue that this system violates the Constitution by placing the power of decision in the hands of a body which is not composed of government employees, but (in some instances) of persons likely to represent the interests of those whose activities are to be regulated, that is, hospitals receiving Hill-Burton grants. They rely primarily on Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), in which the Court said that granting to a majority of coal producers and miners the power to set maximum hours of labor constituted "legislative delegation in its most obnoxious form; for it is not even delegation to any official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business" (*id.* at 311, 56 S.Ct. at 873). Whatever validity *Carter* may still have for the grant of uncontrolled rule-making power to a private body, we think it has no applicability to the present case, where final control over issuance of the regulations remains in the hands of a public official.

---

tion of legislative power, it is an unconstitutional delegation of executive power. However, the parties are agreed, and so are we,

that the power delegated is legislative in nature.

The question presented by plaintiffs is not a novel one and we think that the result we reach is mandated by decisions of the Supreme Court, particularly Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 369 (1939), United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939) and Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L. Ed. 1263 (1940).

■ In *Currin,* the Court upheld a statute which limited the Secretary of Agriculture's power to designate tobacco markets which would be subject to his control, by requiring approval of market designations by a referendum of two-thirds of the tobacco growers. The Court said:

"So far as growers of tobacco are concerned, the required referendum does not involve any delegation of legislative authority. Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given market 'unless two-thirds of the growers voting favor it.' . . . This is not a case where a group of producers may make the law and force it upon a minority (see Carter v. Carter Coal Co., 298 U.S. 238, 310, 318 [56 S.Ct. 855, 872, 80 L. Ed. 1160]) . . . .. Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum is one of these conditions." 306 U.S. at 15–16, 59 S.Ct. at 387.

The shoe fits here. The Council does not itself make regulations. Only the Secretary has that power, a power which is conditioned on the approval of the Council in the same way as the Secretary of Agriculture's power in *Currin* was conditioned on the vote of a majority of tobacco growers.

In *Rock Royal Co-operative,* a similar problem was discussed and a parallel result reached:

"Under . . . the Act it is provided that any order shall become effective . . . if . . . the issuance of the order is approved by two-thirds of the producers interested or by interested producers of two-thirds of the volume . . . .. The objection is made that this is an unlawful delegation to producers of the legislative power to put an order into effect in a market. In considering this question, we must assume that the Congress had the power to put this Order into effect without the approval of anyone. Whether producer approval by election is necessary or not, a question we reserve, a requirement of such approval would not be an invalid delegation." 307 U.S. at 577–578, 59 S.Ct. at 1015 (footnote omitted.)

The Court summarized its position on the delegation question in *Sunshine Anthracite.* There the Court held that as long as the members of a private body to whom powers have been delegated under statute "function subordinately" to a public official or agency and the latter "has authority and surveillance over the activities" of the former, the delegation is not improper. 310 U.S. at 399, 60 S. Ct. at 915. The Court concluded: "Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid." *Id.*

Plaintiffs' reliance on state court cases is misplaced, since the state courts have continued to pay lip service to the doctrine of non-delegation long after the federal courts ceased to do so. 1 K. Davis, Administrative Law Treatise §§ 2.02, 2.07 (1958).

Accordingly, the delegation of a participatory role in the rule-making process to the Council is not constitutionally defective.

*II. Inconsistency with the Governing Statute.*

Plaintiffs argue, secondly, that three provisions of the regulation are invalid because of inconsistency with the gov-

erning statute. Before discussing the challenged provisions themselves, it is desirable to confront squarely the obstacles which plaintiffs must overcome if their attack is to succeed.

A long line of cases[3] supports "the familiar principle that a regulation issued under the direct authority of the statute may not be found invalid for inconsistency unless the variance is so clear that it is manifest that the court has no choice except to hold that the administrator has exceeded his authority and employed means that are not appropriate to the end specified in the act." Gardner v. United States, 239 F.2d 234, 237 (5th Cir. 1957). As the Supreme Court stated in Udall v. Tallman, 380 U. S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):

> "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' Unemployment Comm'n v. Aragon, 329 U.S. 143, 153 [67 S.Ct. 245, 250, 91 L.Ed. 136]. See also e. g., Gray v. Powell, 314 U.S. 402 [62 S.Ct. 326, 86 L.Ed. 301]; Universal Battery Co. v. United States, 281 U.S. 580, 583 [50 S.Ct. 422, 74 L.Ed. 1051]. 'Particularly is this respect due when the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'

Power Reactor Co. v. Electricians, 367 U.S. 396, 408 [81 S.Ct. 1529, 6 L.Ed.2d 924]."

Accordingly, plaintiffs have the heavy burden of showing not merely that the challenged provisions are not the most reasonable of the alternatives permitted by the statute, but that they are "plainly erroneous or inconsistent" (Gulf Oil Corp. v. Hickel, 140 U.S.App.D.C. 368, 435 F.2d 440, 444 (1970)).

The statute against which the regulations are to be measured provides that the Secretary may require of a Hill-Burton applicant an assurance that "there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial viewpoint" 42 U.S.C. § 291c(e)(2). We turn to the specific portions of the regulation claimed by plaintiffs to be inconsistent with this statutory language.

*A. The Presumptive Compliance Guideline.*

The first provision challenged by plaintiffs, 42 CFR § 53.111(d), states:

> "*Presumptive compliance guideline.* An applicant which, for a fiscal year, (1) budgets for the support of, and makes available on request, uncompensated services at a level not less than the lesser of 3 percent of operating costs or 10 percent of all federal assistance provided to or on behalf of the applicant under the Act, or (2) certifies that it will not exclude any person from admission on the ground that such person is unable to pay for needed services and that it will make available to each person so admitted services provided by the facility without charge or at a charge below rea-

---

3. *See, e. g.,* Bingler v. Johnson, 394 U.S. 741, 749–750, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Power Reactor Development Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); United States v. Shimer, 367 U.S. 374, 381–382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961); Bates & Guild Co. v. Payne, 194 U.S. 106, 108–109, 24 S.Ct. 595, 48 L. Ed. 894 (1904).

sonable cost which does not exceed any such person's ability to pay therefor as determined in accordance with criteria established pursuant to paragraph (g), shall be deemed in presumptive compliance with its assurance."

This regulation creates the presumption of compliance by a Hill-Burton facility with the required assurance that it provide "a reasonable volume of services to persons unable to pay therefor," if it makes available uncompensated services equivalent to the lesser of three percent of its operating costs or ten percent of the federal assistance provided under the Act or if it certifies that it will not exclude anyone from receipt of medical services because of inability to pay. This guideline for presumptive compliance establishes a maximum level of services which a Hill-Burton facility can be required by the state agency to provide, because the regulation further states that "in no event shall the level of uncompensated services . . . exceed the presumptive compliance guideline." 42 CFR § 53.111(h)(1).

Providing a method for the determination of what constitutes "a reasonable volume of services" is undoubtedly authorized by the statute. The concept of a maximum required volume provides a useful tool in making such a determination and is not *per se* inconsistent with the statute. Plaintiffs concede that, if a proper formula were worked out, it could be established as a maximum. They argue, however, that the present formula is so rough a measure that when made into an absolute maximum it becomes unreasonable and, therefore, violative of the statute.

Plaintiffs' argument assumes the predicate that the "reasonable volume of services" is intended under the statute to be computed with reference to the community's need for uncompensated services, rather than the facility's financial resources or the amount of federal assistance. Undeniably, community requirements are a relevant element in the determination of what volume of serv-

ices is reasonable. The statute states that its purpose is to assist the states "to furnish adequate hospital, clinic, or similar services to all their people." 42 U.S.C. § 291. The regulation itself recognizes the relevance of community need to reasonableness by requiring that

"The State agency shall for the purpose of making such determination [of the level of uncompensated services] review, and evaluate the annual statement, the budget and the related documents submitted by each applicant [sic] . . . by applying the following criteria: . . .

(iii) The need within the area served by the applicant for the provision, without charge or at charge which is less than reasonable cost, for services of the nature provided or to be provided by the applicant . . . . 42 CFR § 53.111(h)(2).

However, recognition of the relevance of community need is a far cry from accepting plaintiffs' thesis that it is the only relevant criterion to the exclusion of the financial ability of a given facility to provide uncompensated services or of the size of the grant or loan which it received.

■ As to the relevance of a facility's financial resources, the statute states that an assurance may be required that it provide a reasonable volume of uncompensated services, "but an exception shall be made if such a requirement is not feasible from a financial viewpoint." 42 U.S.C. § 291c(e)(2). This proviso clearly indicates that a facility's financial ability to provide uncompensated services is a factor to be considered in determining what constitutes a reasonable volume of such services. This conclusion accords with the dictates of common sense. As was stated in a recent decision:

"The volume of free services of necessity, of course, must bear some reasonable relationship to the resources available to the institution. To require more is to invite financial instability and possible loss of needed med-

ical facilities for the community served." United Appalachian Poor People, Inc. v. Webster County Memorial Hospital, Inc., Civ. No. 71–207 (S.D.W.Va., February 9, 1973), conclusion of law no. 4.

■ Turning to the appropriateness of taking into account the extent of federal assistance, it is self-evident that Congress did not intend to stimulate the construction and modernization of hospitals by a program of grants and loans which depends, as a *quid pro quo*, on the provision of services disproportionately greater than the amount of such assistance. Such an effort would be counterproductive, because, if a program is to provide hospitals with a genuine incentive to expansion and improvement, it cannot demand more than it gives.

■■ Accordingly, we find the two factors embodied in presumptive compliance guideline to bear a reasonable relationship to the ends of the Act. Plaintiffs contend, however, that, regardless of the validity of the approach generally, the percentages actually established by the regulation are arbitrary, at least as a mandatory maximum.

We disagree. We do not possess sufficient information to know with certainty that under all circumstances application of the presumptive compliance guideline would yield results in accordance with the Act. However, we can say that its application to Beth Israel Medical Center, the facility of concern to us in this case, is reasonable, a conclusion which renders further analysis unnecessary. Because Beth Israel Medical Center is large and its Hill-Burton grant comparatively small, the lesser of three percent of operating costs or ten percent of the grant will always be the latter. Accordingly, since the obligation will run for twenty years from completion of the funded construction (42 CFR § 53.-

111(a)(1)), Beth Israel Medical Center can be required under the regulation to provide services equal to twice the amount of the grant. Such a requirement appears to satisfy amply the reasonable volume assurance contemplated by the statute, and the presumptive compliance guideline, as applied in this case, is valid and consistent with the Act.

## B. *The Twenty-year Term.*

■ The second provision challenged by plaintiffs is that which relieves a Hill-Burton grantee of its obligation to provide services to the indigent after twenty years from completion of the facility or portion thereof for which Hill-Burton funds were received. Specifically, the regulation states:

"The provisions of this section apply to every applicant which heretofore has given or hereafter will give an assurance that it will make available a reasonable volume of services to persons unable to pay therefor but shall not apply to an applicant (1) for more than 20 years after the completion of construction of any facility with respect to which funds hve been paid. . . ." 42 CFR § 53.111(a)(1).

The statute itself places no outer limit on the duration of the obligations assumed by a facility in return for federal assistance. Plaintiffs argue that since Congress has, in other assistance programs, placed such a limitation on the term of liability (*see, e. g.,* 20 U.S.C. § 754(a); 42 U.S.C. § 280b–3(b)(1); 42 U.S.C. § 292d(c)(2); 42 U.S.C. § 296a(b)(2)), it could have done so here and failure to do so indicates that such a limitation is repugnant to the wishes of Congress.[4] Doubtless, Congress could have enacted such a provision as part of the statute. Its absence, however, is as consistent with a desire on the part of Congress to leave the task of determin-

---

4. Plaintiffs do not appear to argue that if a maximum term is established the twenty year figure is unreasonable. This period of limitation appears in several of the federal assistance statutes. *See, e. g.,* 20 U.S.C. § 754(a); 42 U.S.C. § 280b–3(b)(1); 42 U.S. C. § 296a(b)(2). Furthermore, the Hill-

Burton Act itself provides that a grantee will be penalized for sale to an entity which is not entitled to receive assistance only if the sale occurs within 20 years of completion of the funded construction. 42 U.S.C. § 291i. Accordingly, twenty years appears to be a reasonable choice.

ing reasonableness to the Secretary and the Council as with a wish to impose an entirely open-ended obligation on Hill-Burton grantees. Moreover, the former interpretation coincides more closely with our understanding of the aims of the Act, which we need not repeat at this point. We do reiterate, however, that, in the particular circumstances of this case, a combination of the presumptive compliance guideline (in this instance ten percent of the grant annually) with the twenty-year term produces a result which is reasonable given the size of the grant.

### C. The Unpaid Bills Provision.

We turn to the third provision challenged by plaintiffs as being inconsistent with the statute. 42 CFR § 53.-111(f)(1) provides:

"In determining the amount of uncompensated services provided by an applicant, there shall be included only those services provided to an individual with respect to whom the applicant has made a written determination prior to any collection effort other than the rendition of bills that such individual is unable to pay therefor under the criteria established pursuant to paragraph (g) of this section except that such collection efforts may be made against a third party insurer or against a governmental program."

This provision implements the statutory phrase "persons unable to pay." It allows a funded facility to postpone determination of a person's inability to pay until after the services are rendered, indeed, until after a bill has been sent and has remained unpaid.

The disadvantage of this system to plaintiffs and those in their position is evident. If a hospital is not obliged to make a determination of indigency prior to the rendition of services, many truly indigent persons may incur liabilities to it in the hope of qualifying for free or below cost services, which they will later be hard pressed to pay if the hospital declines to treat them as beneficiaries of its Hill-Burton assurance on the ground that by the time of billing its require-

ment has been satisfied. Furthermore, plaintiffs argue, many such persons will be discouraged by the ¡ uncertainty of their status from seeking any medical assistance at all.

■ The results suggested by plaintiffs as likely to flow from the regulation do not appear to us, as they do to the federal defendants, as a fantastical "parade of horrors." (Government's Memorandum at 36.) To the contrary, it is difficult to conceive how any other consequences could follow, or be expected to follow from it. Moreover, since there is such a great likelihood that the provision will act to bar "persons unable to pay" for hospital services from seeking to benefit from the uncompensated services which the statute mandates for their benefit, it is antithetical to the goals of the Act.

■ No justification whatever is put forward by either the Beth Israel defendants or the federal defendants. The latter merely state that the provision "permits the hospital to include within the amount of uncompensated services any sums which it determines to be uncollectible, so long as no effort at collection is made other than the rendition of bills." (Id.) This explains but does not justify the provision's adoption. It is fully understandable that hospitals wish to count towards their Hill-Burton requirement all services for which collection proves difficult. The statute, however, does not contemplate this convenient result. Rather, the only services for which the statutory assurance is received are those provided to persons who are "unable", not merely unwilling to pay. Bad debts incurred by the hospitals from persons not covered by the statute are an expense of operating which they must bear themselves.

Accordingly, a determination of genuine inability to pay, in terms of financial resources and income and not merely of refusal to pay the bill, must precede a decision to use the services rendered or to be rendered in satisfaction of the Hill-Burton requirement. In view of the strong interest of plaintiffs in a preadmission determination of inability to

pay, and in the absence of any valid reason for postponement of the decision, we hold that it must be made before rendition of services and that the present provision is invalid.

Accordingly, plaintiffs' motion for summary judgment with regard to the regulation as a whole, the presumptive compliance guideline, 42 CFR § 53.-111(d), and the twenty-year provision, 42 CFR § 53.111(a)(1), is denied. Summary judgment declaring invalid the unpaid bills provision, 42 CFR § 53.-111(f)(1), is granted.

The federal defendants seek to renew, at this time, their motion to dismiss on the ground of primary jurisdiction. Since the regulation has survived plaintiffs' challenge with an exception not relevant to dismissal, it is appropriate that the motion be renewed at this time and renewal is within the contemplation of our original memorandum decision. However, plaintiffs seek and are entitled to additional time to put in papers opposing the renewed motion. Accordingly, the plaintiffs and the Beth Israel defendants are instructed to file such additional papers as they wish with regard to primary jurisdiction within two weeks.

It is so ordered.