559 F.2d 968
 Rosezella COOK et al., on their own behalf, on the behalf of
their minor children and on behalf of all others
similarly situated, Plaintiffs-Appellants,
v.
OCHSNER FOUNDATION HOSPITAL et al., Defendants,
Joseph A. Califano, Jr., Secretary of Health, Education and
Welfare, et al., Defendants-Appellees.
 No. 75-3044.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 22, 1977.
 
 1
 Marilyn G. Rose, Center for Law & Social Policy, Joseph N. Onek, Washington, D. C., for plaintiffs-appellants.
 
 
 2
 Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Edwin E. Huddleson, III, Robert E. Kopp, Rex E. Lee, Asst. Atty. Gen., Harry R. Silver, Atty., Civ. Div., Appellate Section, Dept. of Justice, Washington, D. C., for defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the Eastern District of Louisiana.
 
 
 4
 Before GOLDBERG and FAY, Circuit Judges, and DUMBAULD,* District Judge.
 
 DUMBAULD, District Judge:
 
 5
 This appeal, an outgrowth of a protracted and complex class action,[1] presents only one issue: whether certain regulations framed by the Secretary of Health, Education, and Welfare pursuant to 42 U.S.C. § 291c(e)[2] are invalid either by reason of conflict with the statute pursuant to which they were made or by reason of conflict of interest on the part of certain individuals participating in their formulation.
 
 The Statute
 
 6
 The Secretary's power to make the regulations involved in the case at bar, if it exists, must find its authorization in the language of 42 U.S.C. § 291c (Section 603 of the Hill-Burton Act, as now in force)[3] which provides that with respect to projects financed under Title VI of the Act:
 
 
 7
 The Surgeon General,[4] with the approval of the Federal Hospital Council[5] and the Secretary of Health, Education, and Welfare, shall by general regulations prescribe"(e) that the State plan shall provide for adequate hospitals, and other facilities for which aid under this part is available, for all persons residing in the State, and adequate hospitals (and such other facilities) to furnish needed services for persons unable to pay therefor. Such regulations may also require that before approval of an application for a project is recommended by a State agency to the Surgeon General for approval under this part, assurance shall be received by the State from the applicant that (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant; and (2) there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial viewpoint." (Italics supplied)
 
 
 8
 This provision is a refinement of requirements originating in 1946:
 
 
 9
 (f) That the State plan shall provide for adequate hospital facilities for the people residing in a State, without discrimination on account of race, creed, or color, and shall provide for adequate hospital facilities for persons unable to pay therefor. Such regulation may require that before approval of any application for a hospital or addition to a hospital is recommended by a State agency, assurance shall be received by the State from the applicant that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color, but an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of need for facilities and services of like quality for each group; and (2) there will be made available in each such hospital or addition to a hospital a reasonable volume of hospital services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial standpoint. (Italics supplied[6])
 
 
 10
 The legislation authorized three types of regulations: (1) provision of adequate service to all residents of the area without discrimination;[7] (2) provision of adequate service for the indigent; (3) inclusion of a requirement that assurances by the applicant regarding points (1) and (2) must be received before approval of the project is given and federal funds committed.
 
 
 11
 The present appeal in effect deals only with point (2) since the dispute relates to past grants of Hill-Burton funds to defendant hospitals, rather than to any future grants they may seek. The specific provisions of (3) must be taken into account, however, in interpreting the broader concept of adequacy to furnish needed service for the indigent which point (2) embodies.
 
 
 12
 As so interpreted, the duty of each State to provide for its residents "adequate hospitals . . . to furnish needed services" to the indigent must be measured by a standard of reasonableness. The burden of supplying all services needed by the entire indigent population of the State could not properly be imposed upon the first applicant for a federal grant. The State's plan as a whole is to be fashioned in such a manner that the State's entire arsenal of hospital services will, insofar as possible, be reasonably adequate for the indigent residents of the entire State.
 
 
 13
 Similarly, by the express wording of subsection (e)(2), the individual applicant can not be expected to supply the total quantum of services needed by indigent persons in the territorial area served by the applicant. The obligation is merely to make available "in the facility" or portion of it aided by federal funds obtained by the applicant "a reasonable volume" of charity services.
 
 
 14
 The maximum possible extent of the volume of free services would be merely 100% of the services available in that facility to all patients served, not 100% of the services "needed" by persons in the area served. There might be such an enormous unmet need of free services that several new hospitals might be required to be constructed to furnish the "needed" services. But it can not be supposed that Congress meant that the Secretary should require (as a "reasonable volume" of free services) that a single applicant (say for a small grant for modernization of a hospital's existing facilities, without increasing its capacity or total volume of services at all) should be compelled to meet a need for services which could not reasonably be met without construction of a congeries of new hospitals.
 
 
 15
 But the language can not properly be construed to require that an applicant agree to devote 100% of its capacity "in the facility" aided by federal funds to charity services.
 
 
 16
 A plan envisaged by Congress to extend and increase the available medical services so that they would be adequate "for all persons residing in the State" could not have contemplated that paying patients able to receive services from the existing unimproved facilities should be deprived entirely of the care which they had previously enjoyed. A complete 100% devotion of the facility aided by federal funds to charity services was not contemplated by the legislation.
 
 
 17
 A reasonable ratio between paying patients and free patients was to be maintained, and only "a reasonable volume" of free services made available.
 
 
 18
 A reasonable relationship between the volume of free services and the amount of federal funds received was also contemplated by Congress. The service to indigent patients is a quid pro quo exacted in return for the benefaction received from the taxpayers. As well stated in Corum v. Beth Israel Medical Center, 373 F.Supp. 550, 556 (S.D.N.Y.1974):
 
 
 19
 Turning to the appropriateness of taking into account the extent of federal assistance, it is self-evident that Congress did not intend to stimulate the construction and modernization of hospitals by a program of grants and loans which depends, as a quid pro quo, on the provision of services disproportionately greater than the amount of such assistance. Such an effort would be counter-productive, because, if a program is to provide hospitals with a genuine incentive to expansion and improvement, it cannot demand more than it gives.
 
 
 20
 Moreover, a requirement of free services limited only by the hospital's financial ability, and unrelated to the amount of federal assistance received, would be confiscatory in nature. Congress can not be supposed to have sanctioned such a violation of due process.
 
 
 21
 The final words of subsection (e)(2) seem to indicate that if provision for a reasonable volume of free services "is not feasible from a financial viewpoint," no free service at all need be provided: "An exception shall be made."[8]
 
 
 22
 In any event it is clear, as stated in Corum : "This proviso clearly indicates that a facility's financial ability to provide uncompensated service is a factor to be considered in determining what constitutes a reasonable volume of such services." (373 F.Supp. at 555).
 
 
 23
 How shall "a reasonable volume" of free services be measured and precisely determined, either in man-hours or dollars or in some other terms? By the exercise of expert judgment and discretion by the Secretary in promulgating his regulations, Congress obviously ordained.
 
 
 24
 What then did the Secretary do in the regulations attacked in this appeal? It would seem that he merely quantified or set forth in specific terms, as Congress intended he should, the amount of charity services which constituted "a reasonable volume" of such services.
 
 
 25
 What are the exact terms of the challenged regulations? They are set forth in four and a half pages of type the size of that in the Congressional Record. 42 C.F.R. 53.111, pp. 250-55. We shall summarize the portions relevant to our inquiry.
 
 
 26
 The regulations define "reasonable volume of services to persons unable to pay therefor" as "a level of uncompensated services which meets a need for such services in the area served by an applicant and which is within the financial ability of such applicant to provide." (§ 53.111(b)(7)).
 
 
 27
 The regulations provide that the volume of such services as calculated by the procedure prescribed in the regulations "shall constitute a reasonable volume of services" with respect to an applicant's fiscal year. (§ 53.111(h)(7)).
 
 
 28
 The procedure prescribed for that purpose is to set forth in the State plan and the volume of services is to be established by the State agency "provided that in no event shall the level of uncompensated services established under this section exceed the presumptive compliance guide line." (§ 53.111(h) (1)). The level established by the State agency "may be equal to or less than the presumptive compliance guideline." (§ 53.111(h)(3)(i)).[9]
 
 
 29
 The presumptive compliance guideline directs that an applicant which provides uncompensated service "at a level not less than the lesser of 3 percent of operating costs or 10 percent of all Federal assistance" for the fiscal year will be "deemed in presumptive compliance" with the assurance which 42 U.S.C. 291c(e) authorized the regulations to require before approval of a project.
 
 
 30
 This percentage limitation (which, as we have seen is imposed as a maximum[10] in determining the volume of uncompensated service found to be reasonable) is attacked by appellants as contrary to the statutory authorization. Appellants also attack the twenty year limitation derivable from § 53.111(a). This subsection deals with the applicability of the entire procedure established by the section for determining the volume of services deemed to be reasonable. It renders the whole system inapplicable to an applicant after a lapse of 20 years from completion of construction of any federally financed facility.
 
 
 31
 The provisions of the entire section 53.111 shall not apply to an applicant "for more than 20 years after the completion of construction of any facility with respect to which funds have been paid under section 606 of the Act."[11]
 
 
 32
 If the entire procedure for determining and enforcing what constitutes a reasonable volume of services becomes inoperative after 20 years, it follows that the obligation of the hospital to furnish such services to indigents ceases after that period of time. Appellants contend that the proper interpretation of the statute requires that the obligation remains perpetual so long as the federally financed facility continues in existence.
 
 
 33
 We are unable to accept this view. As previously indicated, the statute contemplates only an obligation to furnish a "reasonable volume" of services to indigents, and such reasonableness implies an appropriate relationship not only to the volume of services to paying patients but also to the amount of the federal financing received.
 
 
 34
 The criteria to be considered by the State agency in making a determination of reasonable volume are set forth in § 53.111(h)(2). As limited by the provision adopting the presumptive compliance guidelines, and the 20 year limitation, the procedure set forth in the regulations appears to us to be proper and in conformity with the statutory authorization conferred by Congress. As stated by the District Court in the case at bar, "Applied in conjunction with the presumptive compliance rule, the 20-year limitation permits Hill-Burton participants to avoid the risk of a financial burden bearing no reasonable relationship to the amount of federal aid."[12]
 
 
 35
 Both of the provisions in the regulations against which appellants direct their attack were involved in Corum, supra, and we believe were properly dealt with in that case. Apparently no other cases directly in point have been cited by counsel or otherwise come to our attention.
 
 Conflict of Interest
 
 36
 The same is largely true of appellant's second ground of attack: that the regulations are invalid because of conflict of interest on the part of certain members of the Federal Hospital Council.
 
 
 37
 The record indicates that the assailed provisions of the regulations were initiated and insisted upon by the Federal Hospital Council, and that the Secretary acquiesced in their issuance rather than sincerely desiring them as a matter of his own official policy.
 
 
 38
 But, as has been seen,[13] the statute required the approval of that body when the Secretary issued the regulations involved, and it is not for the judiciary to psychoanalyze the motives of expediency which may have motivated his action,[14] and induced his willingness to accept the text finally promulgated.
 
 
 39
 It is indisputable that the Secretary did in fact act, and he bears the official responsibility for what he did. From a legal standpoint the approval of the Federal Hospital Council is merely a condition precedent to the operative effect of the Secretary's regulations. No improper delegation of quasi-legislative power is involved. Currin v. Wallace, 306 U.S. 1, 15-16, 59 S.Ct. 379, 83 L.Ed. 441 (1939); Sunshine Coal Co. v. Adkins, 310 U.S. 381, 399, 60 S.Ct. 907, 84 L.Ed. 1263 (1940), cited in Corum, supra, 373 F.Supp. at 552-53. See also U. S. v. Curtiss-Wright Export Corp., 299 U.S. 304, 332, 57 S.Ct. 216, 81 L.Ed. 255 (1936).
 
 
 40
 Appellants point out that one Pat Groner, a member of the Federal Hospital Council, voted for the assailed regulations, although he is director of a Florida hospital which has received Hill-Burton grants of $2,207,735, the largest of which was a grant of $855,464 received in 1949, over twenty years ago. Groner's hospital would thus benefit from the 20 year limitation contained in the regulations.
 
 
 41
 However, the composition of the Federal Hospital council[15] indicates that that body since its inception was intended by Congress to reflect a cross-section of different groups having opposing interests in health care matters. It was merely part of the natural give-and-take of negotiation (as in the case of a collective bargaining contract) if the members representing hospital administration took a different position from those designated to represent "consumerism" interests in the health care field.
 
 
 42
 No improper conflict of interests occurred therefore, even if Groner voted in accordance with the interests of those whose interests he was supposed to represent. A regulation, duly issued by the Secretary, can not be deemed invalid merely because one of the members of a body whose approval was necessary, carried out the purposes of the statute by favoring measures beneficial to the pressure-groups of which he was the designated spokesman.
 
 
 43
 Nor is it demonstrated that his vote was crucial to the outcome of the Council's deliberations. Appellants do not contend that the Council's position was determined by a majority of one, or that Groner's vote or influence was decisive in any way in bringing about the results reached.
 
 
 44
 Accordingly, we conclude that appellants' challenge to the validity of the regulations has not been sustained. The judgment of the District Court is affirmed.
 
 
 45
 AFFIRMED.
 
 
 
 *
 Senior District Judge of the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Some aspects of the voluminous litigation involved are described in Cook v. Ochsner Foundation Hospital, 319 F.Supp. 603 (E.D.La. New Orleans Division, 1970); and Cook v. Ochsner Foundation Hospital, 61 F.R.D. 354 (E.D.La.1972)
 
 
 [2]
 The Public Health Service Act of July 1, 1944, 58 Stat. 682, commonly called the Hill-Burton Act, effected a general reorganization of the Public Health Service. It has been amended frequently, to deal with public health in general, including provisions for grant and loans for construction and modernization of hospitals and medical facilities not operated by the Government. 42 U.S.C. § 291c(e) had its origin in Section 622 of Title VI, added by the Act of August 13, 1946, 60 Stat. 1040, 1042-43. Its present wording comes from Section 603 of Title VI amended by the Act of August 18, 1964, 78 Stat. 451
 
 
 [3]
 78 Stat. 451
 
 
 [4]
 The functions of the Surgeon General were transferred to the Secretary by Reorganization Plan No. 3 of 1966, effective June 25, 1966. See note to 42 U.S.C.A. § 202
 
 
 [5]
 The Federal Hospital Council (42 U.S.C. § 291k), composed of eight appointed members, was created by the Act of August 13, 1946, 60 Stat. 1048-49, and is now regulated by Section 621 of the Hill-Burton Act as amended by the Act of August 18, 1964, 78 Stat. 458
 
 
 [6]
 Section 622(f) of the Hill-Burton Act as amended by the Act of August 13, 1946, 60 Stat. 1043
 
 
 [7]
 This obligation of hospitals receiving Title VI funds, commonly called the "community service obligation," is not involved in this appeal. That phase of the litigation was settled by a consent decree on August 1, 1972. See 61 F.R.D. 354. Subsequent proceedings have been had regarding alleged non-compliance with the decree but are not involved in this appeal
 
 
 [8]
 It may be argued that this is tautologous: if it is financially impossible to provide any free services at all, then the "reasonable volume" of such services would be zero. But normally a reasonable ratio would prevail
 
 
 [9]
 To this language there is a proviso that if there is a need for service greater than proposed by the applicant, and if the applicant is financially able to provide such greater level, the State agency shall establish such greater level as the level applicable to the applicant. (§ 53.111(h)(3)(i)). Were it not for the provision that the presumptive guidelines impose a limit, the issue of confiscatory or excessively high level with relation to the amount of the grant might arise
 
 
 [10]
 By § 53.111(h)(1)
 
 
 [11]
 § 53.111(a). They are likewise inapplicable beyond the period during which a loan remains unpaid
 
 
 [12]
 Memorandum of Reasons, March 12, 1975, p. 8
 
 
 [13]
 See text of 42 U.S.C. 291c, at note 5 supra. It would seem that the Federal Hospital Council is now largely a fifth wheel since Title VI has apparently fallen into desuetude since Title XVI was added to the Public Health Service Act by the "National Health Planning and Resources Development Act of 1974," Act of January 4, 1975, 88 Stat. 2225. A new advisory body was then created, to be known as the National Council on Health Planning and Development, composed of fifteen members, with equal representation of the two political parties among the voting members. Sec. 1503, 88 Stat. 2228-29, 42 U.S.C. § 300k-3. Section 1602, 88 Stat. 2259, 42 U.S.C. § 300o -1, empowers the Secretary (without requiring the approval of any other body) by regulation to
 "(5) require each State medical facilities plan under section 1503 to provide for adequate medical facilities for all persons residing in the State and adequate facilities to furnish needed health services for persons unable to pay therefor; and
 "(6) prescribe the general manner in which each entity which receives financial assistance under this title or has received financial assistance under this title or title VI shall be required to comply with the assurances required to be made at the time such assistance was received and the means by which such entity shall be required to demonstrate compliance with such assurances."
 Section 1604(b)(1)(J), 88 Stat. 2261, 42 U.S.C. § 300o -3(b)(1)(J), provides that applications under Title XVI must include
 "(J) reasonable assurance that at all times after such application is approved (i) the facility or portion thereof to be constructed, or modernized, or converted will be made available to all persons residing or employed in the area served by the facility, and (ii) there will be made available in the facility or portion thereof to be constructed, modernized, or converted a reasonable volume of services to persons unable to pay therefor and the Secretary, in determining the reasonableness of the volume of services provided, shall take into consideration the extent to which compliance is feasible from a financial viewpoint."
 
 
 [14]
 As Mr. Justice Robert H. Jackson said in U. S. v. Public Utilities Commission, 345 U.S. 295, 319, 73 S.Ct. 706, 719, 97 L.Ed. 1020 (1953): "I should concur in this result more readily if the Court could reach it by analysis of the statute (lege regulation) instead of by psychoanalysis of Congress (lege the Secretary)."
 
 
 [15]
 See note 5, supra