726 F.2d 1443
 4 Soc.Sec.Rep.Ser. 123, Medicare&Medicaid Gu 33,647
JOHN MUIR MEMORIAL HOSPITAL, INC., A California nonprofit
corporation, Plaintiff-Appellant,
v.
Carolyne K. DAVIS, Ph.D., Administrator of the Health Care
Financing Administration, Defendant-Appellee.
MT. DIABLO HOSPITAL DISTRICT, dba Mt. Diablo Hospital
Medical Center, Plaintiff-Appellant,
v.
Carolyne K. DAVIS, Ph.D., Administrator of the Health Care
Financing Administration, Defendant-Appellee.
 Nos. 83-1807, 83-1808.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 17, 1983.
Decided March 1, 1984.
 
 Patric Hooper, Prof. Laurence H. Tribe, Weissburg & Aronson, Inc., Los Angeles, Cal., for plaintiffs-appellants.
 Jerry J. Bassett, Michael R. Power, Asst. Reg. Attys., San Francisco, Cal., for defendant-appellee.
 On Appeal from the United States District Court for the Northern District of California.
 Before MERRILL and SKOPIL, Circuit Judges, and GADBOIS*, District Judge.
 MERRILL, Circuit Judge.
 
 
 1
 By this action Appellants John Muir Memorial Hospital and Mt. Diablo Hospital District seek reimbursement from the Medicare program for a portion of their costs attributable to their participation in the Hill-Burton program. Appellee Secretary of Health and Human Services denied the claims. The hospitals sought review of that decision in the District Court. The District Court upheld the Secretary and the hospitals have taken this appeal.
 
 
 2
 Title XVIII of the Social Security Act, 42 U.S.C., Sec. 1395 et seq. (Medicare Act), was enacted in 1965 to provide a program of health insurance for the aged and disabled. Under Part A of the Medicare Act, hospitals which participate in the program are designated as "providers of services" and are paid the reasonable costs of services provided by them to Medicare patients. Those reasonable costs are defined by statute, 42 U.S.C. Sec. 1395x(v)(1)(A), and regulations 42 C.F.R. Sec. 405.401 et seq. Medicare reimburses the provider for that portion of its costs representing the percentage attributable to the care provided to Medicare patients as distinguished from other patients. The statute authorizes the appointment of certain private agencies as "fiscal intermediaries" which review the hospitals' claims for costs and which administer payments due to hospitals from the government.
 
 
 3
 The Hill-Burton Act, 42 U.S.C. Sec. 291 et seq., as originally enacted in 1946 and as amended, makes available to nonprofit hospitals federal funds to construct, expand, and renovate their facilities. In order to receive this federal aid, hospitals are required to provide a reasonable amount of free care to people unable to pay for such care. 42 U.S.C. Sec. 291c(e)(2). In 1972 Hill-Burton regulations established quantifiable guidelines to indicate presumptive compliance with the indigent care obligation. These regulations specified that a reasonable amount of free service was an amount equal to either: (1) 10% of the federal aid given; (2) 3% of operating costs; or (3) care to all indigents appearing at the facility in need of care (the open-door policy). 42 C.F.R. Sec. 53.111(d). The indigent care obligation runs for a period of twenty years following the completion of the Hill-Burton subsidized project. 42 C.F.R. Sec. 53.111(a).
 
 
 4
 John Muir Memorial Hospital received a Hill-Burton grant of $1.25 million to assist it in constructing its original facilities; the construction was completed in 1966. Mount Diablo Hospital District received a Hill-Burton grant of approximately $2.4 million to expand and renovate its hospital facilities. The project was completed in 1976. The hospitals, pursuant to Hill-Burton regulations, are currently meeting their Hill-Burton obligations by rendering services to indigents at a dollar-volume rate of 10% of their Hill-Burton grant each year for 20 years.
 
 
 5
 Blue Cross Association, the fiscal intermediary, excluded from allowable Medicare costs a portion of the hospitals' costs of rendering uncompensated care to indigents pursuant to their Hill-Burton obligations.
 
 
 6
 The hospitals appealed the intermediary's decision to the Provider Reimbursement Review Board, a tribunal of cost reimbursement experts, pursuant to 42 U.S.C. Sec. 1395oo. After a full hearing, the Review Board reversed the determination of the intermediary. The Secretary (through the Administrator of the Health Care Financing Administration) elected to review the Review Board's decision pursuant to 42 U.S.C. Sec. 1395oo (f). On November 12, 1981 the Administrator reversed the Review Board's ruling. The hospitals then appealed to the District Court, pursuant to 42 U.S.C. Sec. 1395oo (f).
 
 
 7
 While those actions were pending in the District Court, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. 97-248 (TEFRA), which provided, inter alia, that those costs associated with the Hill-Burton Act shall not be considered reimbursable under Medicare.[1] The District Court, relying principally on the new legislation, entered judgment in favor of the Secretary on February 17, 1983, 559 F.Supp. 1042. The hospitals now appeal those decisions.
 
 
 8
 The question presented is whether the cost of providing free medical care to indigents under the Hill-Burton Act is reimbursable as a proper Medicare indirect cost. With one exception courts considering this question have answered it in the negative. Catholic Medical Center v. New Hampshire-Vermont Hospitalization Service, Inc., 707 F.2d 7 (1st Cir.1983); Iredell Memorial Hospital, Inc. v. Schweiker, 699 F.2d 196 (4th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 150, 78 L.Ed.2d 139 (1983); St. Mary of Nazareth Hospital Center v. Dep't of Health & Human Services, 698 F.2d 1337 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983); Metropolitan Medical Center v. Harris, 693 F.2d 775 (8th Cir.1982); and Harper-Grace Hospitals v. Schweiker, 691 F.2d 808 (6th Cir.1982), aff'd on rehearing, 708 F.2d 199 (6th Cir.1983); contra Presbyterian Hospital of Dallas v. Harris, 638 F.2d 1381 (5th Cir.), cert. denied, 454 U.S. 940, 102 S.Ct. 476, 70 L.Ed.2d 248 (1981).
 
 
 9
 In Catholic Medical Center v. New Hampshire-Vermont Hospitalization Service, Inc., 707 F.2d at 11, the Court stated:
 
 
 10
 [I]t strains the bounds of logical reasoning to believe that Congress would require hospitals to provide a certain amount of free health care to indigents in reciprocation for receiving federal funds from one program and then allow reimbursement with federal funds from another program for the obligation [they] originally incurred in accepting the Hill-Burton subsidy.
 
 
 11
 In the case before us the hospitals seek to distinguish the cited cases. They point out that their obligation under the Hill-Burton Act is to provide each year for the period of twenty years free care in an amount equal to 10% of the amount of their grant--a total of 200% of the grant. They assert that one-half of this obligation should be considered repayment of the grant "principal," as if the grant were a loan with repayment due the public in the form of indigent health care. The other one-half they characterize as the functional equivalent of interest--the cost of financing their grant. They represent that interest costs are recognized as proper indirect costs, reimbursable under Medicare. They emphasize that they are not, as was true in the cited cases, seeking reimbursement of the whole of the free care costs. They only seek to recover, as an indirect cost of providing care to Medicare patients, that portion of the obligation that is the functional equivalent of interest properly attributable to the Medicare patients. They assert that, while in the cited cases it could be argued that the reimbursement there sought permitted the grantee double recovery of its costs (once by its grant and again by Medicare reimbursement), in the instant case denying the reimbursement sought would give the government a windfall by allowing it double recovery of the amount of its grant.
 
 
 12
 But it is clear from legislative history, as we shall see, that Congress intended this full obligation to constitute the quid pro quo for its grant. This was the bargain that was sought and accepted, and the items making up the sum for which reimbursement is here sought were as much a cost of production of free care as were the remainder.
 
 
 13
 The legislative history of the Hill-Burton Act clearly suggests that it was intended to be more than merely a hospital construction statute. Although the assurances were not in the original bill as introduced by Senator Hill in 1945, Hearings on S. 191 Before the Senate Comm. on Education and Labor, 79th Cong., 1st Sess. 1-6 (1945) (hereinafter "1945 Hearings"), the record of the Senate hearings amply demonstrates that the hospitals' obligation to provide medical services to indigents was a recurrent theme. See 1945 Hearings at 177 (statement of Senator Murray); at 190, 212, 245 (remarks of Senator Ellender); at 30 (remarks of Senator Chavez). There can be little doubt that the legislation was designed to imbue hospitals--at their own expense--with an obligation to provide medical services at low or no cost to the poor.[2] In short, it was intended to preserve the traditional commitment by private hospitals and their communities to provide community service and charitable care. See Rosenblatt, Health Care Reform and Administrative Law: A Structural Approach, 88 Yale L.J. 243, 268-269 (1978); Note, Due Process for Hill-Burton Assisted Facilities, 32 Vand.L.Rev. 1469, 1478-1479 (1979); Rose, Federal Regulation of Services to the Poor Under the Hill-Burton Act: Realities and Pitfalls, 70 Nw.L.Rev. 168, 170-171 (1975).
 
 
 14
 The Act's requirement that free care be provided is subject to an exception: "if such a requirement is not feasible from a financial viewpoint." 42 U.S.C. Sec. 291c(e). Yet that very exception for hospitals in financial straits strongly suggests that the Act contemplated that a hospital otherwise would be required to devote some of its own resources to fulfilling the indigent care assurances. See Catholic Medical Center, 710 F.2d at 10; Rosenblatt, supra, at 267. See also Cook v. Ochsner Foundation Hospital, 559 F.2d 968, 972 (5th Cir.1977) ("service to indigent patients is a quid pro quo exacted in return for the benefaction received from the taxpayers."); Euresti v. Stenner, 458 F.2d 1115, 1118-19 (10th Cir.1972) (hospitals obligated themselves to dispense indigent services in return for receipt of federal funds).
 
 
 15
 Further we find the hospitals' claim that a portion of the care provided to indigents is the functional equivalent of interest to be untenable. The simple answer to their claim is that a "functional equivalent of interest" is not "interest" as defined in the applicable regulations. We note that reimbursable "necessary and proper interest" is limited to interest "incurred on a loan" and "paid to a lender." 42 C.F.R. Sec. 405.419(b). Even if one could characterize a portion of the indigent care as interest on the federal funds, it could hardly be considered paid to a lender. The clarity of the regulatory language leads us to conclude that the free care obligation--irrespective of how one might parse it into its constituent elements--cannot be characterized as interest for purposes of Medicare reimbursement.
 
 
 16
 Nor are we persuaded that the hospitals' "functional equivalent of interest" is otherwise reimbursable as an "indirect cost" of services provided to Medicare patients. 42 U.S.C. Sec. 1395x(v)(1)(A). The Medicare Act does not define "indirect costs." Instead, it mandates that Medicare reimbursement be "determined in accordance with regulations" prescribed by the Secretary. 42 U.S.C. Sec. 1395x(v)(1)(A). The Secretary's regulations enumerate reimbursable indirect costs (which include interest and depreciation expenses, see 42 C.F.R. Secs. 405.415-.419), but make no mention of costs associated with Hill-Burton care. In this respect the regulations are based on accounting principles which recognize a distinction between expenses (such as interest and depreciation) involving asset depletion, and others (such as indigent care) involving revenue depletion. Thus, the regulations disallow reimbursement by Medicare for charity care, bad debts and courtesy allowances because they represent reductions in revenue rather than asset depletion. 42 C.F.R. Sec. 405.420(a) and (b).[3] It is on this distinction that the Secretary relies in denying reimbursement for Hill-Burton costs.
 
 
 17
 Both the First Circuit and the Eighth Circuit have ruled that the Secretary's distinction is a reasonable one and comports with the policies underlying the administration of the Medicare Act. See Catholic Medical Center v. New Hampshire-Vermont Hospitalization Service, Inc., 707 F.2d 7, 10 (1st Cir.1983); Metropolitan Medical Center v. Harris, 693 F.2d 775, 781 (8th Cir.1982). We agree and conclude that disallowance of the hospitals' reimbursements was in accordance with the applicable regulations.
 
 
 18
 Section 106 of TEFRA makes clear that Hill-Burton care costs are not reimbursable under Medicare. The hospitals argue that retroactive application of Section 106 is unconstitutional both because it takes property rights in violation of the Fifth Amendment and because it transgresses boundaries separating the judicial and legislative powers of the federal government. Yet the legislative history of TEFRA establishes that it was intended merely to clarify the provisions of the Medicare Act and to restate what the law had always been.[4] We note that our interpretation of the relevant laws, as they existed prior to enactment of TEFRA, is consistent with that of the Ninety-Seventh Congress. Accordingly, our manner of disposing of the issues we have discussed makes it unnecessary to consider whether retroactive application of TEFRA would be unconstitutional.
 
 
 19
 JUDGMENT AFFIRMED.
 
 
 
 *
 Honorable Richard A. Gadbois, District Judge, United States District Court for the Central District of California, sitting by designation
 
 
 [1]
 The Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. 97-248, provides in part:
 SEC. 106. (a) Section 1861(v)(1) of the Social Security Act is amended by adding at the end the following new subparagraph:
 "(M) Such regulations shall provide that costs respecting care provided by a provider of services, pursuant to an assurance under title VI or XVI of the Public Health Service Act that the provider will make available a reasonable volume of services to persons unable to pay therefor, shall not be allowable as reasonable costs."
 (b) The amendment made by subsection (a) shall be effective with respect to any costs incurred under title XVIII of the Social Security Act, except that it shall not apply to costs which have been allowed prior to the date of the enactment of this Act pursuant to the final court order affirmed by a United States Court of Appeals.
 
 
 [2]
 A revealing discussion took place among Senator Ellender, Senator Pepper, Senator Taft and Dr. Frederick D. Mott, an official of the Department of Agriculture:
 Senator Taft. Let me suggest something else. You would say a hospital accepting aid of this kind should have an obligation to take care of a certain number of indigent patients. Most of them do, but I mean if they are going to have Federal money, should there not be a definite obligation to handle a certain number of indigent patients?
 Dr. Mott. Senator, I would think there would certainly be an obligation to meet the needs of all the people of that hospital service area for which the hospital was designed, which would, of course, include many indigent and medically indigent.
 * * *
 Senator Pepper. This is what occurred to me, Senator ... that in determining the burden which the hospital would be expected to carry, they might not be able to get Federal aid unless they agreed to take a fixed number of indigent patients.
 Senator Taft. That is what I mean. I imagine every hospital of a general nature would be lucky if they did not have 20 percent of indigent patients.
 * * *
 Senator Ellender. If people in all localities were able to pay for hospitalization there would be no need for this bill. It seems to me that our primary purpose should be to devise means to take care of those who cannot take care of themselves. My reason for supporting a bill for Federal aid to build hospitals is to make it easy for the community in which a hospital may be built to give aid to the indigent....
 1945 Hearings at 190-91. See American Hospital Ass'n v. Schweiker, 721 F.2d 170, 176-177 (7th Cir.1983).
 
 
 [3]
 42 C.F.R. Sec. 405.420(c) provides in part:
 The failure to collect charges for services rendered does not add to the cost of providing the services. Such costs have already been incurred in the production of the services.
 
 
 [4]
 Accompanying Section 106 Congress included the following statement of legislative intent:
 The conference agreement includes the House Committee provisions. The provision is intended to clarify that Hill-Burton free care costs have never been, and are not, allowable for medicare reimbursement purposes. The provision, therefore, applies to all such costs that have been, or will be incurred except those recognized by the final judgment of a U.S. Court of Appeals entered into prior to enactment. H.R. 4961, 97th Cong., 2d Sess., 128 Cong.Rec., No. 113, part II, p. H6282; H.R.Rep. No. 97-160, p. 431 (1982).