## METROPOLITAN MEDICAL CENTER AND EXTENDED CARE FACILITY, Appellee,

v.

Patricia HARRIS, Secretary of the Department of Health and Human Services; the United States of America; and Blue Cross and Blue Shield of Minnesota, Appellants,

## METROPOLITAN MEDICAL CENTER AND EXTENDED CARE FACILITY, Appellant,

v.

Patricia HARRIS, Secretary of the Department of Health and Human Services; the United States of America; and Blue Cross and Blue Shield of Minnesota, Appellees.

Nos. 81–2401, 82–1014.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1982.

Decided Nov. 22, 1982.

Rehearing and Rehearing En Banc Denied Jan. 18, 1983.

J. Paul McGrath, Asst. Atty. Gen., James M. Rosenbaum, U.S. Atty., Anthony J. Steinmeyer, John F. Cordes, Attys., Dept. of Justice, Civ. Div., Washington, D.C., for Harris, et al.

Richard I. Diamond, John R. Beattie, Larkin, Hoffman, Daly & Lindgren, Ltd., Mark G. Mishek, Director of Legal Services, Minneapolis, Minn., for Metropolitan Medical Center and Extended Care Facility.

Patricia S. Hofstra, Chicago, Ill., for amicus curiae American Hosp. Ass'n; Leonard C. Homer, Ober, Grimes & Shriver, Baltimore, Md., of counsel.

James D. Kemper, Brenda S. Horn, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for amicus curiae Missouri Hosp. Ass'n.

William J. Keppel, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., for amicus curiae Minnesota Hosp. Ass'n.

Before HEANEY, Circuit Judge, MIL-LER,* Judge, and COLLINSON,** Senior District Judge.

HEANEY, Circuit Judge.

Metropolitan Medical Center and Extended Care Facility (Metro) received a grant, interest subsidy and loan guaranty under the Hill-Burton Act, 42 U.S.C. §§ 291 et seq. As a statutory condition of receiving that Hill-Burton aid, Metro agreed: (1) to make its facilities available to all persons residing in its territorial area—its community service assurance, and (2) to provide a reasonable volume of free medical care to indigents—its free care assurance. Metro also is a provider of medical services under the federal medicare program. 42 U.S.C. §§ 1395 et seq. That program reimburses providers for their "reasonable cost" incurred in treating medicare patients. Metro sought reimbursement from the medicare program for its Hill-Burton free care and community service costs. The Secretary of Health and Human Services (Secretary) denied Metro's claims. The district court [1] reversed in part, holding that Hill-Burton free care costs are a reimbursable expense under the medicare program. The Secretary filed a timely notice of appeal. Metro cross-appealed from the district court's denial of its community service claim. We hold that the Secretary properly construed the Hill-Burton and Medicare Acts in denying Metro's claims for medicare reimbursement for both its Hill-Burton free care and community service costs. The district court's judgment is reversed in part, affirmed in part, and remanded for a determination of whether Metro is entitled to Medicare reimbursement of its community service costs on grounds not considered below.[2]

I.

STATUTORY FRAMEWORK

Neither the Hill-Burton Act nor the Medicare Act expressly addresses the question of whether a health service provider may receive reimbursement from the medicare program for costs incurred in fulfilling its Hill-Burton obligation to provide free care to indigents and community service. We thus review both Acts to determine whether such reimbursement is permissible.

The Hill-Burton Act was passed in 1946 to help remedy the shortage and inadequacy of hospital facilities in the United States. It authorizes grants, loan guarantees and interest subsidies for hospital construction and modernization. 42 U.S.C. § 291a. The Act requires that health care institutions, as a condition of receiving federal funds, "furnish needed services for persons unable to

---

* The HONORABLE JACK R. MILLER, Judge for the United States Court of Customs and Patent Appeals, sitting by designation.

** The HONORABLE WILLIAM R. COLLINSON, Senior District Judge for the United States District Court for the Western District of Missouri, sitting by designation.

1. The Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

2. On September 8, 1982, the President signed into law the Tax Equity and Fiscal Responsibility Act, Pub.L. No. 97–248 (1982). Section 106 of that Act provides:

(a) Section 1861(v)(1) of the Social Security [Medicare] Act is amended by adding at the end the following new subparagraph:

"(M) Such regulations shall provide that costs respecting care provided by a provider of services, pursuant to an assurance under Title VI and XVI of the Public Health Service [Hill-Burton] Act that the provider will make available a reasonable volume of service to persons unable to pay therefor, shall not be allowable as reasonable costs."

(b) The amendment made by subsection (a) shall be effective with respect to any costs incurred under Title XVIII of the Social Security Act, except that it shall not apply to costs which have been allowed prior to the date of enactment of this Act pursuant to the final court order affirmed by a United States Court of Appeals.

The effect of this legislation is to bar medicare reimbursement of Hill-Burton free care costs. Nonetheless, to avoid possible litigation involving the question of whether this amendment to the Medicare Act can be constitutionally applied here, we do not rely on it in reversing the district court's judgment.

pay therefor." 42 U.S.C. § 291c(e).[3] Pursuant to the Act, the Secretary has issued regulations requiring subsidized hospitals to provide certain levels of "uncompensated care" to indigents. 42 C.F.R. § 53.111.[4] The regulations provide several alternative means for hospitals to fulfill their free care obligation, including state approval of the uncompensated services level, "presumptive compliance" through an open door policy and satisfaction of a mathematical formula. 42 C.F.R. § 53.111(d) & (h). The Secretary also has promulgated regulations requiring subsidized hospitals "to give a community service assurance," but unlike the free care regulations, no quantitative compliance provisions have been established.

The Medicare Act, enacted in 1965, provides funding for hospitals' insurance benefits for the aged and disabled. Social Security taxes fund the medicare program, and payments are made out of the Federal Hospital Insurance Trust Fund. 42 U.S.C. § 1395g. Health service providers participating in the program receive reimbursement from the trust fund for the "reasonable cost"—including both direct and indirect expenses—of covered services. 42 U.S.C. § 1395x(v)(1)(A). "Reasonable cost" is "determined in accordance with regulations" promulgated by the Secretary. Id.

There are several steps in the medicare reimbursement process. To participate in the medicare program, a health service provider must file an agreement with the Secretary. 42 U.S.C. § 1395cc. The provider is usually reimbursed through a fiscal intermediary, which is generally a private third party payer. The intermediary has entered into an agreement with the Secretary pursuant to 42 U.S.C. § 1395h, and is a statutorily authorized agent of the Secretary. Id.

The primary duty of the fiscal intermediary is to make payment of funds to providers in accordance with the Medicare Act

and its regulations. Because payment after any necessary audit would result in a lengthy delay between the date services were rendered and the date of payment, estimated payments are made to providers at least monthly, with a subsequent adjustment for any overpayment or underpayment. 42 U.S.C. §§ 1395g & 1395x(v)(1)(A)(ii); 42 C.F.R. §§ 405.402(b)(1) & (2) & 405.454. The intermediary makes a final determination of the proper amount of reimbursable cost at the close of the provider's fiscal year. 42 C.F.R. § 405.406(b). The final determination is based upon a "cost report" which the provider is required to file with the intermediary. Id.

If the provider disagrees with the intermediary's decisions, it may request a hearing before the Provider Reimbursement Review Board (PRRB) when the amount in controversy is $10,000 or more. 42 U.S.C. § 1395oo(a). The Secretary, through the Administrator of the Health Care Financing Administration (HCFA), may review, on his own motion, the decision of the PRRB. 42 U.S.C. § 1395oo(f)(1). If the final administrative decision is adverse to the provider, it may obtain judicial review in the appropriate federal district court. Id.

## II.

## FACTS

Metro is a 736-bed hospital created in 1970 through the consolidation of two other facilities. The predecessor hospitals had received Hill-Burton grants of $911,663 and $432,000 in 1968 and 1969. Metro received an additional $1,456,869 Hill-Burton grant in 1973, making the total grant approximately $2.8 million. In 1973, Metro also received a Hill-Burton loan guaranty and interest subsidy on a loan of $16,765,294. In return for the Hill-Burton aid, it obligated itself to provide some $450,000 in free

---

**3.** As provided for in the Hill-Burton Act, a health care provider enters into a contract with a state Hill-Burton agency to receive federal assistance. The contract includes *inter alia,* the type and amount of aid; the terms of repayment, if any; and the hospital's assurance

to provide an agreed upon amount of free care to indigents.

**4.** The regulations that are controlling here are those that were in effect for the 1977 cost reporting year.

care to indigents during the one-year cost reporting period ending September 30, 1977. Metro claims that it provided $530,521 in free care during this period.

Metro submitted its $530,521 free care claim and $199,419 community service claim as "administrative and general expenses" in its 1977 cost report, and sought reimbursement for medicare patients' proportionate share of these Hill-Burton expenses. The intermediary, Blue Cross, disallowed both claims. Metro appealed, and the PRRB affirmed the intermediary's decision. Finally, the Secretary, through the HCFA Administrator, reviewed the PRRB decision and determined that the intermediary had correctly disallowed Metro's Hill-Burton claim.

Metro challenged the Secretary's final decision in the district court. On cross-motions for summary judgment, the district court overturned the Secretary's decision concerning the free care obligation. It held that Metro's Hill-Burton free care obligation was a reimbursable "reasonable cost" of the medicare program because hospital construction financed by Hill-Burton aid benefited medicare patients. It rejected the Secretary's contentions that Hill-Burton free care was unreimbursable "charity" under the Medicare Act regulations and that such reimbursement would contravene the purpose of the Hill-Burton Act. The district court, however, affirmed the Secretary's decision concerning Metro's community service claim.

The Secretary appeals from the district court's judgment for Metro on the Hill-Burton free care issue. Metro cross-appeals from the district court's denial of its claim for medicare reimbursement for its community service costs.

### III.

### SCOPE OF REVIEW

The issues presented here arise from the interrelationship between the Medicare Act and the Hill-Burton Act. The two statutes must be construed consistently "to produce a symmetrical whole." *Panhandle Eastern Pipe Line Co. v. Federal Power Commission,* 359 F.2d 675, 679 (8th Cir.1966).

■ Issues of statutory construction, of course, are questions of law. An agency's construction of the statute it is charged with administering is entitled to deference by the courts. *Medical Center of Independence v. Harris,* 628 F.2d 1113, 1117–1118 (8th Cir.1980); *Blue Cross Association v. Harris,* 622 F.2d 972, 978–979 (8th Cir.1980). Nonetheless, courts are the final authorities on such issues of statutory construction. *Medical Center of Independence v. Harris, supra,* 628 F.2d at 1117. They remain free to set aside an agency's construction of a statute if it does not have a reasonable basis in law or if it frustrates congressional policy. *Id.* at 1118. With these principles in mind, we turn to the merits of this case.

### IV.

### METRO'S FREE CARE CLAIM

### A. *Medicare Act.*

Under the Medicare Act, Metro is entitled to reimbursement only for the "reasonable cost" of services provided to medicare patients. 42 U.S.C. § 1395f(b). Reasonable cost is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Moreover, reasonable cost is defined to include both direct and indirect costs. *Id.* The statute, however, explicitly provides that "the necessary costs of efficiently delivering covered services to individuals covered by [medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [medicare]." *Id.*

The Secretary contends that because the indigents receiving Hill-Burton free care are not covered by medicare, the foregoing "reasonable care" provisions preclude Metro from receiving medicare payments for its Hill-Burton costs. In his view, such medicare reimbursement is also prohibited by the "charity" regulations he has issued under the Medicare Act. We believe that the Secretary's position is correct.

### 1. *Indirect costs.*

Metro concedes that free care beneficiaries are not medicare recipients and, hence, that the cost of providing services to them is not a compensable direct cost of medicare. Nonetheless, it contends that the free care expenses are reimbursable indirect costs because they benefit medicare, as well as non-medicare, patients by qualifying the hospital for Hill-Burton assistance on construction and modernization projects. Metro also claims that its free care costs are indistinguishable from interest and depreciation, which are indirect expenses for which the Secretary's regulations expressly permit reimbursement.

The Medicare Act does not define "indirect costs;" instead, it directs that medicare reimbursement be "determined in accordance with regulations" prescribed by the Secretary. 42 U.S.C. § 1395x(v)(1)(A). The regulations enumerating reimbursable indirect costs include, *inter alia,* interest and depreciation expenses. They do not include Hill-Burton free care costs. We must sustain the Secretary's decision to include interest and depreciation as reimbursable indirect costs while denying reimbursement for Hill-Burton free care costs as long as this decision has a reasonable basis in law. Although some courts have adopted Metro's position,[5] we believe that the Secretary's view is a reasonable one.

First, there are differences in the accounting treatment of interest and depreciation expenses and of Hill-Burton free care costs that justify the Secretary's decision to treat them differently for medicare reimbursement purposes. Interest and depreciation costs deplete a hospital's assets. In contrast, Hill-Burton free care costs simply reduce the revenue a hospital would otherwise receive from the treated patients.

The Secretary has relied on this distinction to deny medicare reimbursement for other costs incurred by health care providers. His regulations expressly provide that charity, bad debts, and courtesy allowances are not reimbursable under the medicare program because they "represent reductions in revenue. The failure to collect charges for services rendered does not add to the cost of providing the services. Such costs have already been incurred in the production of the services." 42 C.F.R. § 405.-420(a), (b) & (c).

The Secretary's decision to deny medicare reimbursement for Hill-Burton free care costs also comports with his obligation to administer the Hill-Burton Act and Medicare Act in an orderly and consistent manner. The Hill-Burton Act itself, its regulations and its legislative history all show that Congress contemplated that participating hospitals would devote their own resources to satisfy the Act's free care obligation. *See, infra* at 782–787. Similarly, a recurring theme in the Medicare Act and its regulations is that the United States government will not provide medicare reimbursement for costs already subsidized by another federal program.[6]

---

5. *E.g., Presbyterian Hospital of Dallas v. Harris,* 638 F.2d 1381 (5th Cir.), *cert. denied on other grounds,* 454 U.S. 940, 102 S.Ct. 476, 70 L.Ed.2d 248 (1981); *Iredell Memorial Hospital v. Schweicker,* 535 F.Supp. 795 (W.D.N.C. 1982); *St. James v. Harris,* 535 F.Supp. 751 (N.D.Ill.1981).

6. Several provisions of the Medicare Act deny reimbursement to health care providers for expenses for which they receive other federal subsidies. *See* 42 U.S.C. § 1395y(a)(2) (health care services furnished directly to medicare patients for which no person has an obligation to pay); 42 U.S.C. § 1395y(a)(3) (health care services furnished directly to medicare patients which are paid by a governmental entity); 42 C.F.R. § 405.421(g) (educational costs); 42

C.F.R. § 405.422 (research costs). The Secretary concedes that these exclusions do not apply directly to Hill-Burton free care costs, but we, nonetheless, believe that they evince a congressional intent not to provide medicare subsidies to health care providers for activities for which they have received federal assistance in one form or another. We also believe, contrary to Metro's contentions, that Hill-Burton construction aid is an indirect subsidy to hospitals in exchange for the free care that they provide. *See Corum v. Beth Israel Medical Center,* 359 F.Supp. 909, 912 (S.D.N.Y.1973) ("There is no dispute that under Federal law and by contract, part of the *quid pro quo* for the [Hill-Burton] grant is the requirement that [the hospital] afford poor persons a reasonable amount of free or below cost services.").

Finally, although the Medicare Act's "reasonable cost" provision permits a hospital to recover the indirect costs of serving medicare recipients, it expressly forbids the Secretary from imposing on the medicare program expenses incurred by non-medicare patients, including presumably Hill-Burton free care beneficiaries. 42 U.S.C. § 1395x(v)(1)(A). Under the broad definition of "indirect cost" advanced by Metro, virtually any expenditure by a hospital that arguably benefits the facility as a whole would be a reimbursable "reasonable cost" of providing service to medicare patients. This result is contrary to 42 U.S.C. § 1395x(v)(1)(A), in which Congress plainly evinced its intent not to make the medicare program an insurer of all costs incurred by participating hospitals, regardless of how tangentially related to treatment for medicare patients.

### 2. The "Charity" Regulations.

■ The Secretary also has interpreted his "charity" regulations to prohibit medicare reimbursement for Hill-Burton free care costs. These regulations, issued pursuant to the Medicare Act, explicitly exclude "charity" care as a reimbursable cost under the medicare program. 42 C.F.R. §§ 405.-402(c)(7), 405.420. "Charity" is defined as "reductions in charges made by the provider of services because of the indigence or medical indigence of the patient." 42 C.F.R. § 405.420(b)(2).

Metro contends that Hill-Burton free care is not charity because it is mandated by law rather than voluntarily provided. The district court agreed with Metro and declined to apply the charity exclusion to Hill-Burton free care. We disagree.

The charity regulations do not contain a voluntary-mandatory distinction. Rather, they apply whenever there are "reductions in charges * * * because of * * * the indigence or medical indigence of the patient." 42 C.F.R. § 405.420(b)(2). Hill-Burton free

care plainly fits within that definition.[7] Indeed, courts construing the Hill-Burton Act in other contexts have recognized in a commonsense fashion that the free care requirement constitutes "charity." See American Hospital Association v. Harris, 625 F.2d 1328, 1330 (7th Cir.1980); Cook v. Ochsner Foundation Hospital, 559 F.2d 968, 972–973 (5th Cir.1977).

Moreover, the Hill-Burton Act's legislative history plainly reveals that Congress included the free care obligation to ensure that the hospitals would continue their tradition of making charitable contributions to indigents, rather than to create a new legal obligation for them. See infra at 784–785.

Thus, the Secretary properly relied on his "charity" regulations to deny Metro medicare reimbursement for its Hill-Burton free care costs.

### B. Hill-Burton Act.

■ Metro also argues that the Hill-Burton Act does not preclude medicare reimbursement for its free care costs because the Act's legislative history and early regulations show that the Act was enacted exclusively as a construction assistance program. The court below agreed, concluding that "[t]here is no evidence of any intent to require a hospital to pay for rendering the free care, only that facilities be made available to all people." We cannot agree. The text of the Act, its implementing regulations, its legislative history and the case law construing it all show that medicare reimbursement for free care costs is inconsistent with the Hill-Burton Act.

### 1. The Text of the Act.

The Hill-Burton Act expressly authorizes the Secretary to issue regulations requiring participating hospitals to assure Hill-Burton authorities that "there will be made available * * * a reasonable volume of services to persons unable to pay therefor * * *." 42

---

7. The district court itself ignored its "mandatory" rationale by requiring the medicare program to reimburse the hospital not only for the $450,000 in Hill-Burton free care that it had

contractually obligated itself to provide, but also for the additional $80,521 in free care that Metro provided beyond its agreement with the Minnesota Hill-Burton agency.

U.S.C. § 291c(e). The same statutory section also creates "an exception [to the free care assurance] * * * if such a requirement is not feasible from a financial viewpoint." *Id.* These provisions of the Hill-Burton Act flatly contravene Metro's argument that Congress intended it to be exclusively a construction assistance program. Besides giving participating hospitals the opportunity to obtain construction aid, the Act's plain language imposes upon them a duty to provide free care to indigents. And the "financial infeasibility" escape provided by Congress shows that it contemplated that the hospitals would have to devote some of their own resources to providing the free care. *See* Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach,* 88 Yale L.J. 243, 267 (1978).

### 2. The Regulations.

In addition, pursuant to the authority expressly delegated him by the Hill-Burton Act, 42 U.S.C. § 291c(e), the Secretary has promulgated regulations requiring subsidized hospitals to provide certain levels of "uncompensated services" to indigents. 42 C.F.R. § 53.111. *See, infra* at 783. They expressly forbid a hospital from counting toward its Hill-Burton free care obligation any services to indigents for which the hospital has received reimbursement from another governmental program, including specifically medicare. 42 C.F.R. §§ 53.-111(b)(4), (d) & (f)(2). These regulations plainly support the Secretary's decision here. Metro and *amicus,* the American Hospital Association, however, claim that they do not apply to medicare reimbursement for Hill-Burton free care. We disagree.

Metro and *amicus* first state that the free care regulations were issued some thirty years after the Hill-Burton Act was passed in 1946. Thus, in their view, they are inconsistent with the Act's exclusive purpose of providing construction assistance. First, we do not agree that the Hill-Burton Act was adopted solely as a construction assist-

ance program. *See, infra* at 783–785. Moreover, although Metro and *amicus* do not say as much, this argument amounts to a claim that the existing Hill-Burton free care regulations are invalid. These regulations have been repeatedly upheld. *E.g., Cook v. Ochsner Foundation Hospital, supra,* 559 F.2d at 975; *Corum v. Beth Israel Medical Center,* 373 F.Supp. 550, 554–556 (S.D.N.Y.1974).

Metro and *amicus* alternatively urge the regulations in 42 C.F.R. § 53.111 eliminate from the free care compliance computation only money received by the hospital for *direct* services provided to medicare beneficiaries. They claim the regulations do not apply to medicare payments to the hospital for services rendered to non-medicare patients which only indirectly benefit medicare recipients. Nothing in the regulations supports this limiting construction. They explicitly exclude from the Hill-Burton free care computation "all actual or estimated reimbursements, as applicable, for services received or to be received pursuant to Title XVIII and XIX of the Social Security [Medicare] Act (42 U.S.C. 1395 and 1396)," 42 C.F.R. §§ 53.111(b)(4) & (d), and "[a]ny amount which the applicant has received, or is entitled to receive * * * under a governmental program." 42 C.F.R. § 53.-111(f)(2)(i). This unqualified language excludes from the Hill-Burton computation "any" and "all" medicare reimbursement— whether for direct care to medicare patients or for free care to non-medicare patients which may indirectly benefit medicare recipients.

### 3. The Legislative History.

■ Despite the foregoing language in the Hill-Burton Act and its regulations, Metro contends that the Act's legislative history shows that it established only a construction assistance program. Thus, it argues that medicare reimbursement for its free care costs is consistent with the Hill-Burton Act.[8] We again cannot agree.

---

8. Metro also relies on the first Hill-Burton regulations, enacted in 1947, which provided:

"[Free] care may be paid for wholly or partly out of public funds or contributions of individu-

There is, as Metro contends, legislative history supporting the view that the Act's primary purpose was to facilitate hospital construction.[9] Nonetheless, there also is ample legislative history showing that Congress intended the Act to include a free care obligation as well as construction assistance, and that Congress was well aware that the obligation would impose some financial burden on hospitals and their local communities.

The original bill did not include the language requiring hospitals to give free care assurances. In committee hearings, the Chief Medical Officer of the Department of Agriculture's Farm Security Administration commented that the bill should contain safeguards to ensure that aid recipients effectuate the bill's stated purpose of providing facilities to furnish adequate medical services to the people. *Proposed Amendments to the Public Health Services Act: Hearings on S 191 Before the Committee on Education and Labor,* 79th Cong., 1st Sess. 188–189 (1945) (hereafter 1945 *Hearings* ). Senator Taft suggested that "a hospital accepting aid of this kind should have an obligation to take care of a certain number of indigent patients." *Id.* at 190. The Department of Agriculture official responded: "[T]here would certainly be an obligation to meet the needs of all the people of that hospital service area for which the hospital was designed, which would, of course, include many indigent and medically indigent." *Id.*

In the ensuing colloquy among the Committee members, the fear was expressed that a free care requirement would overburden a hospital. *Id.* at 190–196. Nevertheless, the senators' comments indicate that they understood that Senator Taft's suggestion would impose upon participating hospitals a duty to provide care for those unable to pay for medical treatment.[10] *Id.*

---

als and private and charitable organizations such as Community Chest or may be contributed at the expense of the hospital itself." 12 Fed.Reg. 6179 (1947). Metro claims that the reference to "public funds" shows a congressional intent to authorize medicare reimbursement for its free care costs. We cannot agree with this construction. This regulation simply provided that the free care could be financed through state or local efforts (public or private) or through the hospital's own resources. The reference to "public funds" could not have contemplated additional federal funds beyond the Hill-Burton construction subsidy because no federal assistance was available for that purpose in 1947.

9. For example, Senator Hill, in response to queries by Senator Langer about possible amendments to provide for the rendition of services to veterans at Hill-Burton institutions, stated:

However, I do not believe that this is the place to deal with that subject. I believe that it is a matter which must be dealt with, not from the standpoint of this bill, but as a matter of policy. This bill is simply a bill to provide Federal aid for construction or enlargement of hospitals.

\* \* \* \* \* \*

The pending bill does not go into the questions of maintenance and operation of hospitals.

91 Cong.Rec. at 11796 (1945).

Similarly, Senator Taft said:

The bill does not purport to deal with the question of maintenance of hospitals or the provision of medical care for the indigent. The bill is purely a construction bill.

*Id.* at 11723.

These remarks, read in context, make it clear that the senators were expressing their intention to limit federal funding to construction assistance, and not to provide federal money for payment of medical services. They were not suggesting that the Hill-Burton Act should not include a free care obligation as a condition for receiving construction assistance. *See* Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach,* 88 Yale L.J. 243, 266 (1978).

10. Senator Pepper: This is what occurred to me, Senator \* \* \*. [I]n determining the burden which the hospital would be expected to carry, they might not be able to get Federal aid unless they agreed to take a fixed number of indigent patients.

Senator Taft: That is what I mean. I imagine every hospital of a general nature would be lucky if they did not have 20 percent of indigent patients.

\* \* \* \* \* \*

Senator Ellender: If people in all localities were able to pay for hospitalization there would be no need for this bill. It seems to me that our primary purpose should be to devise means to take care of those who cannot take care of themselves. My reason for supporting a bill providing for federal aid to build hospitals is to make it easy for the community in which a hospital may be built to give aid to the indigent \* \* \*.

*See* Comment, *Provision of Free Medical Services by Hill-Burton Hospitals,* 8 Harv. Civ.Rts.—Civ.Lib.L.Rev. 351, 354 (1973). No further discussion of a free care requirement is contained in the 1945 Hearings.

The legislative history after the bill was amended to include the free care and financial infeasibility provisions also suggests that Congress intended to make participating hospitals devote some of their own resources to providing free care to indigents. It frequently refers to communities' needs for subsidized charitable health care, and contains discussions describing private nonprofit hospitals' traditional commitment to community service and charitable care. *See, e.g.,* 91 Cong.Rec. 11724 (1945) (Senator Taft); 1945 *Hearings,* at 25 (President of the American Hospital Association) and 100 (Senator Taft); *Hearings on S. 191 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce,* 79th Cong., 2d Sess. 14–15 (1946) (hereafter 1946 *Hearings*) (Surgeon General). Congress recognized that such charitable care by private hospitals would not resolve the nation's problem of providing medical care to the poor. *See, e.g.,* 1945 *Hearings,* at 64–65 (Senator Pepper), and 194–195 (Senator Taft). Nevertheless, Congress clearly intended to preserve the traditional commitment by private hospitals and their communities to providing community service and charitable care. *See* Note, *Due Process for Hill-Burton Assisted Facilities,* 32 Vand.L. Rev. 1469, 1478–1479 (1979); Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach, supra,* 88 Yale L.J. at 268–269; Rose, *Federal Regulation of Service to the Poor Under the Hill-Burton Act: Realities and Pitfalls,* 70 Nw.L.Rev. 168, 170–171 (1975). Indeed, under questioning about whether recipient hospitals could restrict their services to

those who could afford to pay, the president of the American Hospital Association assured the Senate Committee on Education and Labor that low-income people "who get into [recipient hospitals] will be taken care of at the Local level," and that the state plan would have to locate hospitals primarily according to the needs of "people that cannot get hospitalization on their own means." 1945 *Hearings,* at 34. Similarly, one of the Act's authors, Senator Hill, stated that the bill was intended to "serve as a challenge to the States and Local communities to prove that they can and will live up to their responsibilities." 91 Cong.Rec. 11716 (1945).

We believe that the foregoing legislative history shows that the Secretary's decision here is consistent with Congress's intent to require Hill-Burton hospitals to devote some of their own resources to providing free care to the poor.

4. *The Case Law.*

The Secretary's decision is also consistent with the case law construing the Hill-Burton free care obligation. After more than two decades of agency nonenforcement of that obligation, litigation was initiated in the early 1970s involving instances where seriously ill persons were denied hospital care because they were Medicaid recipients, or because they did not have cash for deposits, a private physician or sufficient funds. Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach, supra,* 88 Yale L.J. at 270–271.

In a series of cases, federal courts recognized that indigent patients had a right to challenge Hill-Burton hospitals for failing to fulfill their statutory free care obligation.[11] The implication of these cases was

---

Senator Taft: My interest in [this bill] is like in a public works bill, just to provide construction. But beyond that, these facilities must be made available to the people. 1945 *Hearings,* at 190–191.

11. *See Saine v. Hospital Authority of Hall County,* 502 F.2d 1033, 1034–1035 (5th Cir. 1974); *Euresti v. Stenner,* 458 F.2d 1115, 1119 (10th Cir.1972); *Corum v. Beth Israel Medical Center,* 359 F.Supp. 909, 914–915 (S.D.N.Y. 1973); *Organized Migrants in Community Action, Inc. v. James Archer Smith Hospital,* 325 F.Supp. 268, 270–271 (S.D.Fla.1971); *Cook v. Ochsner Foundation Hospital,* 319 F.Supp. 603 (E.D.La.1970).

that in accepting federal construction assistance, Hill-Burton hospitals were assuming the burden of providing a certain amount of uncompensated service to indigents. For example, in *Euresti v. Stenner,* 458 F.2d 1115, 1118–1119 (10th Cir.1972), the Court said "[n]othing could be clearer: In receiving federal funds, [defendant hospitals] obligated themselves to dispense a reasonable amount of free hospital services to those unable to pay." Similarly, in *Cook v. Ochsner Foundation Hospital, supra,* 559 F.2d at 972, the Fifth Circuit commented that "[t]he service to indigent patients is a *quid pro quo* exacted in return for the benefaction received from the taxpayers."

In direct response to those decisions, the Secretary in 1972 promulgated the free care regulations in issue here,[12] which for the first time, translated the vague congressional directive requiring Hill-Burton hospitals to provide "a reasonable volume of free care to those unable to pay therefor" into a dollar and cents requirement.

5. *Financial Impact of the Free Care Obligation.*

■ Metro and *amicus* raise two final arguments: First, they urge that it is unlawful to forbid medicare reimbursement for Hill-Burton free care because it places the entire free care obligation on paying patients. We cannot accept this argument. The Hill-Burton Act does not require paying patients to assume the hospital's free care responsibility. It does not preclude Metro from relying on charitable fund raising or community support to satisfy its Hill-Burton commitment to provide medical care to the poor. Moreover, the hospital's professional staff can provide more free care to indigents than they are currently providing. Indeed, these efforts would be consistent with "the traditions of service and sacrifice" underlying the Hill-Burton

Act. 1946 *Hearings,* at 14–15 (Remarks of Surgeon General).

■ Second, Metro and *amicus* contend that if free care costs are not reimbursable, hospitals—including presumably Metro—will be in a worse financial position than they would have been without the original Hill-Burton subsidy. The record here simply does not show that Metro is the poorer for having accepted Hill-Burton aid. In any event, if Metro could in fact establish a sufficient financial hardship, the Hill-Burton Act contains an exception which would permit it to avoid its free care obligation. 42 U.S.C. § 291c(e). Finally, hospitals and hospital associations have repeatedly attempted to persuade courts that the Hill-Burton free care obligation is too burdensome. Courts have uniformly rejected that claim, and upheld the Secretary's regulations establishing quantitative compliance requirements. *See, e.g., Cook v. Ochsner Foundation Hospital, supra,* 559 F.2d at 575; *Wyoming Hospital Association v. Harris,* 527 F.Supp. 551, 554–561 (D.Wyo.1981); *Corum v. Beth Israel Medical Center, supra,* 373 F.Supp. at 554–556.

C. *Summary.*

For the foregoing reasons, we hold that the Secretary's denial was based on a proper construction of the Medicare and Hill-Burton Acts and their implementing regulations. Accordingly, we reverse the district court's judgment that Metro is entitled to medicare reimbursement for its Hill-Burton free care costs.

V.

## METRO'S COMMUNITY SERVICE CLAIM

Metro cross-appeals from the district court's denial of its claim for medicare reimbursement for the cost—$199,419—of

12. For a discussion of the development of the Secretary's regulations regarding the Hill-Burton free care and community service assurances, *see* Note, *Due Process for Hill-Burton Assisted Facilities,* 32 Vand.L.Rev. 469 (1979); Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach,* 88 Yale L.J. 243 (1978); Rose, *Federal Regulation of Service to the Poor Under the Hill-Burton Act; Realities and Pitfalls,* 70 Nw.L.Rev. 168 (1975); Comment, *Provision of Free Medical Services by Hill-Burton Hospitals,* 8 Harv.Civ.Rts.—Civ. Lib.Rev. 351 (1973).

providing several "community outreach" programs. The programs were primarily for the elderly, were conducted at the patients' residences rather than at Metro, and included, *inter alia,* treatment of certain minor medical problems and discussion of preventive health care techniques.

Metro argues that it is entitled to medicare reimbursement for these expenditures because they indirectly benefit medicare patients by qualifying the hospital for Hill-Burton assistance. The premise of its argument is that the Hill-Burton Act's "community service" requirement obligated it to incur the cost of the outreach programs.

The district court held that Metro's community service expenditures were not mandated by the Hill-Burton Act and, thus, denied its claim for reimbursement. We agree that the Hill-Burton Act did not require Metro to provide its outreach programs. Nonetheless, we remand this matter to the district court with directions to remand it to the PRRB for a determination of whether those expenditures are otherwise reimbursable under the Medicare Act.

■ The Hill-Burton Act requires a participating hospital to give a community service assurance in addition to its free care promise. The Act states that a hospital must promise that "the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant." 42 U.S.C. § 291c(e). The Secretary's regulations also state:

(c) *Assurance.* Before an application under this part is recommended by a State agency to the Secretary for approval, the State agency shall obtain an assurance from the applicant that the facility will furnish a community service.

(d) *Compliance.* In order to comply with its community service assurance an applicant must:

(1)(i) Make the services it furnishes available to the general public, or

(ii) Limit the availability of such services only on the basis of age, medical indigency, or type or kind of medical or mental disability[.]

42 C.F.R. § 53.113.

The plain language of the statute and the regulations suggest that the community service requirement is intended to prevent Hill-Burton hospitals from engaging in discriminatory admission practices. In sharp contrast to the Hill-Burton free care obligation, neither the Act nor its regulations require participating hospitals to take affirmative steps or make any financial expenditures to satisfy their community service obligation.

■ The Hill-Burton Act's history also plainly shows that Congress enacted the community service obligation only to ensure nondiscriminatory admissions. Section 622(f) of the original Act required participating hospitals to promise that their facilities "will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color * * *." It is clear from the text of this provision, and its legislative history, that Congress's intent was to forbid racial discrimination in the admission of persons to Hill-Burton hospitals. *See, e.g.,* Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach, supra,* 88 Yale L.J. at 266–267, 279–280.

In *Simkins v. Moses H. Cone Hospital,* 323 F.2d 959 (4th Cir.1963), *cert. denied,* 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964), the Fourth Circuit struck down an exception to section 622(f)'s community service obligation that permitted "separate-but-equal" facilities. Thereafter, Congress amended the community service provision to require participating hospitals to give assurances that their facilities "will be made available to all persons residing in the territorial area of the applicant." 42 U.S.C. § 291c(e).

Although some senators recognized that the amended language might later be interpreted to refer to issues other than racial discrimination, the dominant legislative intent underlying the new community service provision clearly was to acquiesce in *Simkins* complete prohibition of racial discrimi-

nation without including explicit statutory language to that effect. *Extension and Revision of Hill-Burton Hospital Construction Program: Hearings on H.R. 10041 Before the House Committee on Interstate and Foreign Commerce,* 88th Cong., 2d Sess. 53–54 (1964). *See* Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach, supra,* 88 Yale L.J. at 267–268, 279–280.

Finally, courts construing the community service requirement have also recognized—at least implicitly—that it imposes upon Hill-Burton hospitals a duty not to discriminate, not a financial obligation. For example, in *Lugo v. Simon,* 426 F.Supp. 28 (N.D. Ohio 1976), and *Cook v. Ochsner Foundation Hospital,* Civ. No. 70–1969 (E.D.La.1975), federal courts struck down the twenty-year durational limit that the Secretary had included in his community service regulations. Both courts expressly premised their holdings, at least in part, on their conclusion that the hospitals incurred no major financial liabilities in serving all persons in their communities in a nondiscriminatory manner.

Thus, the Hill-Burton community service requirement is a nondiscrimination provision which does not impose a duty upon hospitals to make any specific expenditures. Accordingly, we affirm the district court's decision that Metro is not entitled to medicare reimbursement for the cost of its outreach programs on the ground that they were mandated by the Hill-Burton Act. We do not hold, however, that the Medicare Act necessarily bars Metro from receiving reimbursement for its outreach programs.

Outreach programs provide valuable medical services and information to people in need who may not have ready access to a hospital. Moreover, they familiarize people with the services and staff available at Metro, and build goodwill in the community, thereby attracting patients to the hospital who otherwise may go elsewhere. Indeed,

the record shows that Metro, in large part, established its outreach programs for this very purpose since increased capacity utilization helps reduce hospitalization costs for all patients—medicare and non-medicare alike. This indirect benefit to Metro's medicare patients may entitle the hospital to reimbursement for its outreach program expenditures. In this regard, we note that the Secretary's regulations permit medicare reimbursement for certain costs hospitals incur in advertising to the general public.

■ Alternatively, Metro argues for the first time on appeal that its outreach programs are reimbursable indirect costs because they were required as a condition of obtaining a certificate of need from state authorities. Under Minnesota law, a hospital must obtain such a certificate before constructing new facilities. Minn.Stat. §§ 145.832 *et seq.* Medicare reimbursement for such certificate of need costs apparently would not be contrary to Minnesota law in the manner that reimbursement for free care costs contravenes the Hill-Burton Act. *See Faulkner Hospital Corp. v. Schweiker,* 537 F.Supp. 1058 (D.Mass.1982) (finding costs incurred as a result of state imposed certificate of need requirements eligible for medicare reimbursement).

Accordingly, we remand this matter to the district court with directions to remand it to the PRRB to determine whether Metro is entitled to reimbursement of its community service costs under any provision of the Medicare Act or its regulations. The PRRB should consider the two foregoing possibilities, and any others advanced on remand.[13] The district court should retain jurisdiction over this matter.

## VI.

## CONCLUSION

For the foregoing reasons, the decision is reversed in part, affirmed in part, and remanded to the district court for further

---

**13.** In any event, if Metro is not entitled to reimbursement for its outreach programs under any provision of the Medicare Act or its regulations, it can count such expenditures—to the extent that the services are provided without fee to indigents—toward satisfaction of its Hill-Burton free care obligation.

proceedings consistent with this opinion. All pending motions to submit additional briefs in this matter are denied.